NOTICE: Under Supreme Court Rule 367 a party has 21 days after the

filing of the opinion to request a rehearing. Also, opinions are

subject to modification, correction or withdrawal at anytime prior

to issuance of the mandate by the Clerk of the Court. Therefore,

because the following slip opinion is being made available prior to

the Court's final action in this matter, it cannot be considered

the final decision of the Court. The official copy of the following

opinion will be published by the Supreme Court's Reporter of

Decisions in the Official Reports advance sheets following final

action by the Court.

                                    

               Docket No. 76490--Agenda 1--September 1996.

     THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LEONARD KIDD,

                               Appellant.

                    Opinion filed December 19, 1996.

          JUSTICE MILLER delivered the opinion of the court:

          Following a jury trial in the circuit court of Cook

County, the defendant, Leonard Kidd, was convicted of four counts

of murder, one count of armed robbery, one count of aggravated

arson, and four counts of concealment of a homicidal death. At a

separate sentencing hearing, the same jury found the defendant

eligible for the death penalty and further determined that there

were no mitigating circumstances sufficient to preclude imposition

of that sentence. The defendant was accordingly sentenced to death

for the murder convictions, and he received sentences of

imprisonment for the remaining convictions. The defendant's

execution has been stayed pending direct review by this court. Ill.

Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the

reasons that follow, we affirm the judgment of the circuit court,

as modified.

          The defendant previously pleaded guilty to these charges

and was sentenced to death at that time. In an earlier appeal, this

court found the defendant's plea to be defective because of

improper admonitions given to the defendant at the plea hearing,

and accordingly vacated his convictions and death sentence. People

v. Kidd, 129 Ill. 2d 432 (1989). The case then proceeded to trial

on remand.

          The present offenses were discovered on January 12, 1983,

when investigators responding to the report of a fire found the

bodies of three adults, Renee Coleman, Michelle Jointer, and

Ricardo Pedro, and one child, Renee's son Anthony, in an apartment

at 1553 West 91st Street in Chicago, where Coleman lived with her

son and Jointer. The victims were bound and gagged, and they had

been stabbed repeatedly. Two separate fires had been set inside the

apartment. Following an investigation, the defendant and his half-

brother, Leroy Orange, were taken into custody and charged with

these offenses. Their trials were severed at an early stage in the

proceedings.

          In the proceedings below, the State presented extensive

evidence of the defendant's involvement in these crimes. Because

the defendant does not challenge the sufficiency of the State's

proof of his guilt, only a brief recitation of the trial evidence

is necessary here; additional evidence will be summarized as it

becomes relevant to the discussion of specific issues. The

defendant made a series of statements to police after he was

arrested, and these were introduced into evidence at trial. The

defendant initially told officers that he and his brother, Leroy

Orange, were at Coleman's apartment on the night of the murders.

The defendant said, however, that he had left there around 4:30 in

the morning, when Orange began arguing with Ricardo Pedro. The

defendant explained that he decided to leave when the confrontation

turned violent. The defendant said that before he could do so,

however, "two dudes" entered the apartment; both of them had

knives. The defendant remained outside the building, and he said

that he later saw the two men leave; one was wearing a jacket

covered with blood. At that time, the defendant gave inconsistent

accounts of the identities of the two men he had seen; at one

point, the defendant said that one was named "Slick Rick." After

the defendant made that statement, police brought Leroy Orange into

the room where the defendant was being interrogated. Orange told

the defendant that he had already admitted committing the murders

and, further, had told authorities that there was no "Slick Rick."

          The defendant gave police a second statement later that

evening. In the second statement, the defendant said that he was

the Sportsman's Lounge at 79th and Halsted Streets during the

evening of January 11, 1983. Around 10:30 Orange and Renee Coleman

arrived, and they later took the defendant to the defendant's

residence, where the defendant gave them a combination TV/radio

"box." The defendant then returned alone to the Sportsman's Lounge.

He went back home some time later, where he received a telephone

call from Orange around 12:30 a.m. Orange said that he was having

"a problem with a stud," and the defendant then went to Coleman's

apartment. The defendant said that Orange and Pedro later began

fighting, and Orange stabbed Pedro. The defendant attempted to help

Pedro in one of the bedrooms in the apartment. Sometime later,

according to the defendant, Orange stabbed Pedro again. Orange also

forced Coleman to tie up her son, and Orange bound and gagged

Coleman and Jointer and stabbed the victims.

          The defendant repeated many of the preceding details in

a formal statement he gave several hours later in the presence of

a court reporter. While in custody, the defendant also led police

to various garbage cans near Coleman's apartment where the knives

used in the attack had been discarded. The defendant also showed

the officers where other evidence, including drug paraphernalia,

clothing, and burnt debris, had been left.

          At trial, the State also presented testimony given by the

defendant at Leroy Orange's trial on these charges, and at the

defendant's own sentencing hearing, conducted following the

defendant's earlier guilty plea. At Orange's trial, the defendant

claimed that he alone committed the murders and maintained that he

stabbed the victims when Orange was not present. The defendant, in

the testimony he gave at his sentencing hearing, again said that he

alone committed the crimes. On that occasion, however, the

defendant also mentioned that he saw red things coming at him when

he stabbed the victims.

          Defense counsel introduced into evidence Orange's own

inculpatory statement to authorities. In that statement, Orange

claimed sole responsibility for the crimes. The defendant also

presented the testimony of Dr. Linda Wetzel, a clinical

psychologist, who had interviewed the defendant and given him

various tests. Dr. Wetzel concluded, among other things, that the

defendant was mentally retarded, had brain damage, and possessed a

compliant nature.

          At the close of evidence, the jury found the defendant

guilty of the charges of murder, aggravated arson, armed robbery,

and concealment of homicidal death. The matter then proceeded to a

capital sentencing hearing. At the first stage of the sentencing

hearing, the jury found the existence of three separate aggravating

circumstances rendering the defendant eligible for the death

penalty: the commission of multiple murders, murder in the course

of a felony--armed robbery in this case--and murder of a child

under 12 years of age in a brutal or heinous manner. Ill. Rev.

Stat. 1983, ch. 38, pars. 9--1(b)(3), (b)(6), (b)(7).

          At the second stage of the sentencing hearing, the State

presented testimony of the defendant's lengthy record of

misconduct, occurring inside and outside prison. The defendant had

incurred a substantial number of disciplinary tickets for his

infractions while incarcerated. On a number of occasions the

defendant threatened prison personnel and other inmates. In one

incident, the defendant struck a handcuffed inmate on the head

three times with an unopened can of food that was concealed inside

a sock. In mitigation, the defendant presented the testimony of Dr.

George Savarese, a licensed social worker, who had complied a

comprehensive social history of the defendant. In preparing that

report, Dr. Savarese interviewed the defendant's family members and

friends, and also reviewed a number of records and reports

concerning the defendant. Dr. Savarese described the defendant's

troubled childhood and history of drug use, as well as other

aspects of the defendant's life. Following the consideration of

evidence in aggravation and mitigation, the jury determined that

there was no mitigating circumstance sufficient to preclude a

sentence of death. Accordingly, the defendant was sentenced to

death for the murder convictions.

          The judge sentenced the defendant to consecutive terms of

30 years' imprisonment for the convictions for aggravated arson and

armed robbery. The judge imposed terms of five years' imprisonment

for each of the four convictions for concealment of a homicidal

death. Those sentences were to run concurrently with each other but

consecutively to the prison terms for aggravated arson and armed

robbery.

                              I. Trial Issues

                                     A

          The defendant first argues that he was entitled to a

fitness hearing under the rule announced in People v. Brandon, 162

Ill. 2d 450 (1994), because he was taking "psychotropic drugs or

other medications under medical direction" (725 ILCS 5/104--21(a)

(West 1992)) at the time of the trial and sentencing hearing in

this case. Specifically, the defendant asserts that he was then

taking Dilantin, for treatment of epilepsy, and he further states

that he had previously taken two others drugs, Tegretol, also for

epilepsy, and Elavil, an antidepressant.

          We note that the record discloses only that the defendant

was receiving Dilantin at the time relevant here; evidence of his

treatment may be found in the testimony of Dr. Wetzel, who related

that the defendant was receiving the drug when she interviewed him

shortly before trial. It appears that the defendant had epilepsy

and that he took Dilantin as treatment for that condition. The

State argues, however, that the special protection afforded by

section 104--21(a) of the Code of Criminal Procedure of 1963 must

be limited to psychotropic drugs, and that Dilantin is not a

psychotropic drug. Our recent opinion in People v. Britz, No. 76618

(October 18, 1996), resolves a number of the issues here. In Britz,

this court construed the reference in section 104--21(a) to

"psychotropic drugs or other medications" as being limited to

psychotropic drugs; accordingly, treatment with a nonpsychotropic

medication is not sufficient to trigger the statute. Slip op. at

24-25. The question remains whether Dilantin is properly classified

as a psychotropic drug, and therefore whether the defendant's use

of that medication during trial would have entitled the defendant

to a fitness hearing under the provisions of section 104--21(a).

          Britz further clarified what drugs are psychotropic by

adopting the definition found in the Mental Health and

Developmental Disabilities Code (405 ILCS 5/1--100 through 6--107

(West 1994)). Slip op. at 25-26. Section 1--121.1 of the Code

defines the term "psychotropic medication" as a "medication whose

use for antipsychotic, antidepressant, antimanic, antianxiety,

behavioral modification or behavioral management purposes is listed

in AMA Drug Evaluations, latest edition, or Physician's Desk

Reference, latest edition, or which are administered for any of

these purposes." 405 ILCS 5/1--121.1 (West Supp. 1995). Applying

this definition, we conclude that Dilantin is not a psychotropic

drug for purposes of the fitness provision of section 104--21(a).

Dilantin is prescribed for the treatment of epilepsy, not for any

of the purposes specified in the definition found in section 1--

121.1 of the Mental Health and Developmental Disabilities Code.

Moreover, neither of the references cited in the preceding

definition indicate that Dilantin is used for psychotropic

purposes. According to the Physician's Desk Reference, Dilantin

(phenytoin) is an anticonvulsant drug used to treat epilepsy and to

prevent and treat seizures occurring during or following

neurosurgery. Physician's Desk Reference 1906--13 (50th ed. 1996);

see also AMA Drug Evaluations 371 (AMA 1994) (phenytoin is a drug

used to control epileptic seizures).

          Because the defendant was not entitled to a fitness

hearing under section 104--21(a), defense counsel could not have

been ineffective for failing to seek one pursuant to that

provision. Accordingly, we do not address the defendant's

additional argument that he received ineffective assistance of

counsel when his trial attorneys failed to invoke section 104--

21(a).

          In the alternative, the defendant asks that we now remand

the cause to the circuit court so that additional information may

be presented about other medications the defendant might have been

receiving at the time of trial. The defendant has found references

in various portions of the record in this case to his prior

treatment with two other drugs: Tegretol, another epilepsy

medication, and Elavil, an antidepressant. The defendant notes that

a similar procedure was followed in People v. Kinkead, 168 Ill. 2d

394 (1995).

          We believe that Kinkead is readily distinguishable from

the present case. In Kinkead, the defendant's presentence report

related the defendant's statement that he had been taking

Thorazine, a psychotropic drug, while in jail awaiting trial on the

charges in that case; the report also noted other drugs the

defendant had previously received for treatment of depression. In

addition, the report referred to suicide attempts by the defendant,

and to his treatment at Menard Psychiatric Center. Kinkead, 168

Ill. 2d at 403. The details of the defendant's treatment with

Thorazine could not be ascertained from the record, however, and

therefore the court believed that a remand was necessary to clarify

the schedule of treatment. The court noted further that there was

no indication in the record regarding the possible effects of that

drug.

          We do not agree with the defendant that Kinkead is

controlling here. In contrast to Kinkead, in the present case,

there is no indication in the record that the defendant was

actually receiving a psychotropic drug at any point near the time

of trial or sentencing in this case. The references to his earlier

treatment all predate, by substantial periods, the beginning of the

defendant's trial, in May 1993. Moreover, the defendant had been

examined by two psychiatrists in November and December 1991 and had

been found fit at that time. To adopt the defendant's argument in

this case and order a remand for development of a further

evidentiary record would mean that a remand must be available in

every case in which the record contains some reference to the

defendant's long-ago treatment with a psychotropic drug. We decline

to extend Kinkead in that manner.

                                     B

          The defendant next argues that the trial judge erred in

failing to grant a defense motion to quash the defendant's arrest

and to suppress evidence stemming from the arrest. The police did

not have an arrest warrant, and the defendant contends that they

lacked probable cause to make the arrest.

          The offenses charged here were discovered by authorities

sometime after 6 a.m. on January 12, 1983. In the apartment police

found an address book containing Leroy Orange's name and providing

two addresses for him, 702 E. 75th Street, and 7915 S. Emerald;

Leroy's mother and half-brother, the defendant in this case, also

resided at the latter address. Investigating officers learned from

Enitowec Durr that Leroy Orange had been with Renee and others in

the apartment around 9 o'clock the preceding night; Durr had spoken

to Renee on the telephone around that time and had learned in the

course of the conversation that Orange was at the apartment. Durr

told police that Leroy was Renee's former boyfriend and that the

two had not been getting along well. Three persons who had been at

Renee's apartment the preceding night reported that Leroy was there

when they left, around midnight.

          Detectives McNally and McCabe went to the 75th Street

address between 2 and 3 p.m. on January 12, where they talked to

Mildred Orange, Leroy's wife. Mrs. Orange told the officers that

Leroy had left the residence around 7 o'clock the preceding night

and had not returned that night. When Mrs. Orange learned that the

police were trying to locate Leroy, she called the South Emerald

Street address and discovered that he was there. McNally and McCabe

remained with Mrs. Orange, while other officers went to South

Emerald Street to arrest Leroy. Mrs. Orange also told the officers

that when she had arrived home from work that afternoon, she had

discovered a pair of shoes, pants, a shirt, and a jacket that had

not been there in the morning. Mrs. Orange was able to identify the

pants as belonging to the defendant.

          Around 3:45 that afternoon, Mrs. Orange received a

telephone call from the defendant. Officers McNally and McCabe were

still with her. In the telephone call, the contents of which Mrs.

Orange later related to the officers, the defendant said that Leroy

had been arrested, and the defendant asked Mrs. Orange to call the

police and find out what the charges were. The defendant also said

that he needed to talk to Mrs. Orange, and he made arrangements to

meet her at a McDonald's restaurant. The defendant told Mrs. Orange

" `that he and Leroy were involved in something that could put him

in jail for the rest of their lives.' " Later that afternoon, the

defendant was arrested at the McDonald's restaurant where Mrs.

Orange had gone to meet him.

          To effect a warrantless arrest, a police officer must

have probable cause to believe that an offense was committed and

that the person to be arrested committed it. Beck v. Ohio, 379 U.S.

89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225 (1964); People v.

Montgomery, 112 Ill. 2d 517, 525 (1986); see also Ill. Rev. Stat.

1983, ch. 38, par. 107--2(1)(c). Under the probable cause standard,

"[e]vidence that will sustain a conviction is not required, but

more than mere suspicion is necessary. [Citation.]" In re D.G., 144

Ill. 2d 404, 412-13 (1991) (Miller, C.J., dissenting). The burden

is on the defendant to show the illegality of the challenged search

or seizure. Ill. Rev. Stat. 1983, ch. 38, par. 114--12(b). A trial

court's ruling on a motion to suppress will not be reversed on

appeal unless it is manifestly erroneous. People v. Williams, 147

Ill. 2d 173, 209 (1991). There was no doubt in the present case

that crimes had been committed; the only relevant question before

the police officers was whether the defendant was one of the

persons involved in their commission.

          In making a warrantless arrest of the defendant, the

police relied on information provided to them by Mildred Orange and

on other information they had acquired in the course of their

investigation of these offenses. We conclude that the officers had

probable cause to arrest the defendant for these offenses.

Following their conversations with Mrs. Orange and their

investigation of the crime scene and of evidence found there, the

police knew that the defendant had implicated himself in an

unspecified offense with his brother, Leroy Orange. The police also

knew that Leroy Orange had been present at the crime scene the

preceding night, several hours before the murders. Also, the police

knew from Mrs. Orange that a change of clothes had been left in her

apartment that day, and that at least one of those garments

belonged to the defendant.

          From the circumstances of the offenses, the police also

would have realized that it was likely that more than one offender

was involved. The number of victims and the condition in which they

were found strongly suggested that the crimes in this case were the

work of multiple offenders; that three adults and one child had

been tied up and repeatedly stabbed suggested the actions of more

than one person. Thus, when the defendant implicated himself to

Mrs. Orange in an offense in which he said Leroy was also involved,

the police would have had probable cause to believe that the

defendant was involved in the crimes in this case.

          The defendant argues, however, that Mrs. Orange must be

considered an informant, and the defendant maintains that she was

of untested and unestablished reliability. Mrs. Orange does not fit

easily into either of the two major categories by which informants

have traditionally been classified. Although Mrs. Orange was not a

witness or victim of the crime, she was not a paid informant,

either. Still, the importance of those classifications are less

significant than they once were. "[I]t matters not by what name the

informant is labelled; we look rather to the informant's

reliability as only one of the factors to be considered in the

totality of the circumstances approach. [Citations.]" People v.

Adams, 131 Ill. 2d 387, 397 (1989). As this court has explained:

                    "The rationale of protecting against

               unreasonable search and seizures by demanding

               reliable information from informants is still

               relevant under the totality of the circumstances

               test adopted by this court in People v. Tisler

               (1984), 103 Ill. 2d 226. Thus, the basis of the

               informant's knowledge is indeed relevant (i.e.,

               whether it is based on being a victim or witness or

               whether he is a reliable paid informant); however,

               the rigidity embodied in the presumptions

               concerning the classifications is no longer

               applicable." Adams, 131 Ill. 2d at 398.

"Thus, based on an evaluation of all of the information available,

including the source of the information, the question is one of

whether there is probable cause to believe that the individual in

question is involved in criminality." Adams, 131 Ill. 2d at 398.

          We believe that the circumstances here satisfy the

standards relating to arrests based on informants' tips. The

totality of the circumstances known to the arresting officers fully

supported their reliance on the information provided by Mrs.

Orange. Immediately after the conversation with the defendant, Mrs.

Orange told the officers who were present in her apartment what the

defendant had just said; she had no time to fabricate. In People v.

Wright, 111 Ill. 2d 128, 146 (1985), this court noted:

               "[D]ecisions analyzing the probable cause standard

               reveal that it is a `practical, nontechnical

               conception.' [Citation.] `In dealing with probable

               cause, *** we deal with probabilities. These are

               not technical; they are factual and practical

               considerations of everyday life on which reasonable

               and prudent men, not legal technicians act.'

               [Citations.]"

Given the circumstances of the police officers' visit with Mrs.

Orange, and the information she provided to them, the arresting

officers were justified in crediting her report of her telephone

conversation with the defendant. The defendant's contention that

Mrs. Orange's conduct should be viewed as an attempt to deflect

attention away from her husband is without merit, for she helped

the police locate Leroy, and she told the officers about the

defendant's statement implicating Leroy.

          The defendant notes that the testimony at the suppression

hearing showed that he told Mrs. Orange that he and Leroy had done

something that could put "him" in jail. Emphasizing the singular

"him," the defendant argues that the statement must be construed as

implicating only Leroy. We do not agree. First, the remainder of

the statement contains a number of plural elements: the comment

that "he and Leroy were involved" in something, and the reference

to "their lives." In addition, Mrs. Orange's testimony at trial

below, and the defendant's testimony at Leroy Orange's trial, also

introduced into evidence in this case, related a slightly different

version of the statement, in which the defendant quite clearly

implicated himself in Leroy's offenses. Thus, at the defendant's

trial, Mrs. Orange testified that the defendant told her,

" `Mildred, I've got something to tell you that could put me and

Poky [i.e., Leroy] away for the rest of our lives." In testimony at

his brother's trial, also introduced into evidence here, the

defendant recounted, "I said we done something bad that could put

us in jail for the rest of our life [sic]." We may consider these

additional pieces of testimony even though they were not introduced

at the suppression hearing; in reviewing a pretrial suppression

ruling, a court may rely on evidence introduced at the ensuing

trial. People v. Sims, 167 Ill. 2d 483, 500 (1995); People v.

Caballero, 102 Ill. 2d 23, 33-36 (1984); People v. La Bostrie, 14

Ill. 2d 617, 620-21 (1958). It thus seems clear that the defendant

implicated both himself and Leroy in the unspecified offenses.

          In conclusion, we believe that the trial judge's decision

to deny the defendant's motion to quash the arrest was not against

the manifest weight of the evidence. The testimony showed that the

police had probable cause to believe that the defendant was

involved in the present offenses. The defendant's inculpatory

statement to Mrs. Orange, the circumstances of the offenses, and

Leroy's presence at Renee's apartment hours before the crimes

provided the police with probable cause to arrest the defendant. We

note that our conclusion that the officers had probable cause to

arrest the defendant is not altered even if we use a de novo

standard of review for this mixed question of law and fact. See

Ornelas v. United States, 517 U.S. ___, 134 L. Ed. 2d 911, 116 S.

Ct. 1657 (1996) (applying de novo standard of review to issues

involving reasonable suspicion to stop vehicle and probable cause

to conduct search). We believe that probable cause for the

defendant's arrest was established by the circumstances in this

case, summarized above, including the defendant's statement to Mrs.

Orange, Leroy's presence at the apartment the preceding night, and

the likely involvement of more than one offender.

 

                                     C

          The defendant also argues that the trial judge erred in

denying his motion to suppress his statements. The defendant

contends that the statements were the products of physical coercion

inflicted by the police officers who interrogated him. The

defendant asserts that the trial judge erred in refusing to

suppress his statements because the State failed to demonstrate, by

clear and convincing evidence, that his injuries were not the

result of police misconduct. See People v. Wilson, 116 Ill. 2d 29

(1987); People v. La Frana, 4 Ill. 2d 261 (1954).

          Unlike the cases cited by the defendant, there was no

showing here that the defendant sustained an injury while in police

custody. At the suppression hearing, the police officers who

interrogated the defendant denied the defendant's allegations of

mistreatment. Dennis Dernbach, the assistant State's Attorney who

had taken the defendant's formal statement, and who is now a judge,

testified that the defendant had no complaints about his treatment

while in custody. Dernbach had noticed a mark on the defendant's

forehead, and the defendant explained that he had incurred it a

week or two earlier, when he was the victim of a robbery. This

injury is depicted in a photograph taken at the conclusion of the

defendant's formal statement, as well as in a photograph taken at

the Cook County jail the next day. The defendant did not testify at

the suppression hearing.

          The State must show by a preponderance of the evidence

that the defendant made the statement voluntarily. People v. R.D.,

155 Ill. 2d 122, 134 (1993); People v. King, 109 Ill. 2d 514, 525

(1986); Ill. Rev. Stat. 1987, ch. 38, par. 114--11(d); see Lego v.

Twomey, 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619,

627 (1972). Voluntariness will be determined by considering the

totality of the circumstances. People v. Smith, 152 Ill. 2d 229,

253 (1992); People v. Melock, 149 Ill. 2d 423, 447 (1992); People

v. Clark, 114 Ill. 2d 450, 457 (1986). A reviewing court will

reverse the trial court's disposition of a motion to suppress a

statement only if the ruling is against the manifest weight of the

evidence. People v. Jones, 156 Ill. 2d 225, 242-43 (1993); People

v. Evans, 125 Ill. 2d 50, 77 (1988); People v. Kincaid, 87 Ill. 2d

107, 120 (1981).

          We find no reason to disturb the trial judge's ruling in

the present case. The testimony at the suppression hearing

established that the defendant's statements were not the products

of coercion. Although there is photographic evidence that a mark

was present on the defendant's forehead after he made his

statement, there was no testimony that the defendant received that

injury while he was in police custody, or that he did not have that

injury before being taken into custody. In fact, the evidence in

this case suggests otherwise. Dernbach's testimony showed that the

defendant had sustained his one visible injury sometime before he

was taken into custody, when he was the victim of a robbery. The

defendant told Dernbach that the officers had treated him all right

and did not have any complaints about his treatment. In addition,

all the officers who took part in the interrogation of the

defendant denied any mistreatment of him. It was the trial judge's

responsibility to determine the credibility of the witnesses, and

he was entitled to credit the testimony introduced by the

prosecution. On this record, we cannot say that the decision to

deny the defendant's suppression motion was contrary to the

manifest weight of the evidence.

                                     D

          The defendant next argues that the trial judge erred in

allowing the State to introduce into evidence in this case the

defendant's testimony at Leroy Orange's trial on these charges and

the defendant's testimony at his own earlier sentencing hearing.

The defendant raises three arguments in support of the exclusion of

these statements. The defendant contends that in introducing the

earlier testimony the State was presenting false evidence. In

addition, the defendant argues that the testimony he gave at

Orange's trial resulted from a conflict of interests on the part of

his former trial attorney and must now be excluded on that ground.

Finally, the defendant maintains that the testimony at the earlier

sentencing hearing was tainted by the defective guilty plea that

preceded it. The defendant moved before and during trial to exclude

the two statements, but the trial judge refused to do so, and the

evidence was admitted over the defendant's objections. We believe

that both statements were admissible, and we find no error in their

introduction into evidence in the present case.

          The defendant first argues that both excerpts of his

earlier testimony required exclusion here because the evidence was

false. The defendant contends that admission of the statements in

the present case therefore violated the rule forbidding the

prosecution to knowingly present perjured testimony. See Napue v.

Illinois, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct.

1173, 1177 (1959); People v. Jimerson, 166 Ill. 2d 211, 223 (1995).

          In support of this theory, the defendant notes that when

he testified at Orange's trial, the prosecution impeached him with

the statements he made to the police following his arrest; in the

station house statements, the defendant said only that he was

present at the crime scene, and he maintained that he did not take

part in the commission of the offenses. The defendant apparently

believes that the State has conceded the falsity of any statement

by the defendant in which he admits his involvement in these

offenses.

          We do not believe that the rule prohibiting the

prosecution's knowing use of perjured testimony is applicable here,

or was designed to reach the conduct complained of in this case.

The statements at issue were all made by the defendant and, so long

as they were relevant to the case, could be introduced against him

as admissions of a party opponent. People v. Simpson, 68 Ill. 2d

276, 282 (1977); Gillson v. Gulf, Mobile & Ohio R.R. Co., 42 Ill.

2d 193, 197 (1969). If the defendant has given various accounts of

his activities on the night of the offenses, then, as the trial

judge noted in refusing the exclude the prior testimony, "that's

his problem, and he has to live with it." We do not believe that

the State must now be disabled from presenting the defendant's

earlier inculpatory statements simply because there are

discrepancies in what the defendant has said at different times on

different occasions.

          The defendant also argues that his testimony at the

Orange trial must be excluded because it was the product of a

conflict of interest involving his former attorney, Earl

Washington. Washington originally represented both the defendant

and Leroy Orange on these charges. Washington later withdrew from

the defendant's case, however, and the public defender was then

appointed to represent the defendant in this case.

          The defendant notes that under the present Rules of

Professional Conduct, an attorney who ceases to represent a client

may not later pursue a course of representation that is inimical to

the earlier client's interests. 134 Ill. 2d R. 1.9. The defendant

also cites cases in which an attorney has appeared as both

prosecutor and defense counsel in the same proceeding. See People

v. Lawson, 163 Ill. 2d 187 (1994); People v. Kester, 66 Ill. 2d 162

(1977). The defendant likens Washington's role here to that of a

prosecutor, for, as the defendant notes, Washington pursued a

theory of defense at Orange's trial that alleged the defendant's

sole responsibility for these crimes.

          We find no evidence here that the defendant's testimony

in his brother's case can be attributed to a conflict of interests

involving the defendant, Earl Washington, and Orange. Washington

was no longer representing the defendant when the defendant

testified at Orange's trial; Washington's representation of the

defendant had ceased long before that point. Although the defendant

notes that Washington later provided authorities with information

incriminating to the defendant in another case, which is the

subject of a separate prosecution (see People v. Kidd, 147 Ill. 2d

510 (1992)), the defendant fails to explain how his decision to

testify on Orange's behalf at Orange's trial was anything other

than the defendant's own decision, or how Washington exploited any

confidential information he might have acquired during his former

representation of the defendant.

          The defendant has not identified any particular facts

that show how his testimony at Orange's trial resulted from a

conflict of interests. Assuming that exclusion would be necessary

if the defendant's prior testimony was a consequence of his former

attorney's conflicting interests, we do not believe that the

defendant has established the factual predicate that would trigger

application of that rule. We find no error in the trial judge's

decision here to allow the State to present the testimony given by

the defendant at Leroy Orange's trial. 

          The defendant raises an additional challenge to the use

in this case of the testimony he gave following an earlier plea of

guilty to these charges. The defendant was sentenced to death at

that time. The plea was defective, however, and was vacated by this

court on appeal (People v. Kidd, 129 Ill. 2d 432, 443-47 (1989))

because the defendant had not been told of the minimum mandatory

sentence he would face if convicted on the charges. Of course, at

trial below, the jury was informed only that the defendant's

testimony was from a prior, unspecified proceeding; the jurors were

not told of the defendant's earlier plea or sentence or the outcome

of the earlier appeal.

          The defendant contends that the invalidity of the plea

that preceded the earlier sentencing hearing tainted his testimony

at that hearing and rendered those statements inadmissible at the

present trial, or, as the State aptly notes, that the testimony at

the sentencing hearing was the "fruit of a poisonous plea." As a

preliminary matter, we do not agree with the State that the

defendant has waived consideration of this point. During trial, in

seeking to exclude this evidence, defense counsel argued that

vacatur of the plea should preclude use of the testimony from the

sentencing hearing. We conclude that counsel preserved the

objection.

          Turning to the merits of the defendant's argument, we do

not believe that the invalidity of the defendant's prior plea

necessitates the exclusion of the testimony given by the defendant

at the ensuing sentencing hearing. In the present circumstances,

there would be no point in precluding the State from using

testimony given by the defendant at the sentencing hearing that

followed the plea. The defendant's testimony was voluntary, and we

do not believe that a rule requiring its exclusion can be justified

as a means of deterring the occasional errors committed by judges

in accepting guilty pleas.

          Citing Harrison v. United States, 392 U.S. 219, 20 L. Ed.

2d 1047, 88 S. Ct. 2008 (1968), the defendant asserts that the

testimony he gave at the earlier sentencing hearing was the product

of the invalid plea that preceded it. We believe that Harrison is

distinguishable. In that case, the defendant's confessions were

introduced into evidence at trial, and the defendant testified in

his own behalf, seeking to overcome the impact of those statements.

The defendant's conviction was reversed on appeal, however, because

the statements were inadmissible. On retrial, the prosecution

introduced Harrison's testimony from the first trial. The Supreme

Court held that the testimony given by Harrison at the original

trial had been offered by the defendant to overcome the impact of

the illegally admitted evidence, and thus the testimony could not

later be used against him as evidence of guilt.

          In the present case, unlike Harrison, there was no causal

connection between the trial judge's failure to correctly admonish

the defendant about his minimum sentence and the defendant's

subsequent testimony at the sentencing hearing, during which he

admitted his involvement in these crimes. In the present case, the

defendant's testimony at his sentencing hearing was consistent with

his earlier plea, and, unlike the testimony in Harrison, cannot be

said to have been offered by him to overcome the impact of the

earlier illegality. The defendant in this case voluntarily chose to

testify at that time.

          In any event, we believe that any error in the

introduction of the testimony from the sentencing hearing was

harmless beyond a reasonable doubt. See Arizona v. Fulminante, 499

U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991). The

prosecution introduced other inculpatory statements by the

defendant, including his testimony at Orange's trial, in which the

defendant admitted his participation in the crimes. Other evidence

established that the defendant had directed the police to where the

murder weapons could be found. On this record, we believe that any

error in the introduction of the sentencing hearing testimony was

harmless beyond a reasonable doubt.

                                     E

          The defendant next asserts error in the State's use at

trial of identification testimony by a fireman who saw the

defendant at the crime scene shortly after the commission of the

offenses charged here. Chicago fire fighter James Thomas testified

that as he was walking to a fire engine to obtain a piece of

equipment, someone approached him and asked whether anyone inside

the building had died; Thomas replied affirmatively. The person

then asked whether the bodies had burned; Thomas replied that they

had not burned. According to Thomas, the person then uttered the

word "Damn" and walked away. This encounter occurred sometime

before 7 o'clock on the morning of the fire, January 12, 1983. Two

days later, on January 14, Thomas was reading a newspaper account

of the offenses and thought that he recognized one of the two men

pictured in the story as the person who had approached him with the

question about the victims. Thomas relayed this information to his

lieutenant. Several days later, police officers showed Thomas the

same news story, and Thomas made the same identification. At trial,

Thomas identified the defendant as the man who had approached him

at the fire and as the person whose photograph he had seen in the

newspaper.

          The defendant argues that Thomas' identification was

tainted because officers showed Thomas the same newspaper

photographs and failed to conduct a lineup. We do not agree. The

witness' in-court identification of the defendant had an

independent origin and was not based on any allegedly suggestive

technique employed by the police. See Simmons v. United States, 390

U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971 (1968);

People v. Williams, 60 Ill. 2d 1, 10-11 (1975).

          Nor do we agree with the defendant that the State

misrepresented to the jury the strength of the witness' testimony.

In a voir dire examination conducted outside the presence of the

jury, Thomas allowed that he was not certain that the defendant was

the man whom he had seen on the morning of the fire; Thomas said,

"To be perfectly honest, I couldn't say exactly that that's the

man." Before the jury, on direct examination, the prosecutor simply

asked Thomas whether the person Thomas had talked to on the morning

of the fire was in the courtroom; Thomas replied that the man was

in the courtroom and identified the defendant. Later, during cross-

examination, Thomas acknowledged that he was not absolutely certain

that the defendant was the man he had seen. The circumstances of

Thomas' identification of the defendant were before the jury,

including the details of their brief conversation more than nine

years before the present trial. We find no error in the admission

of this testimony.

                                     F

          The defendant next complains of the admission of certain

testimony at the guilt phase of the proceedings below. The

defendant first argues that the medical examiner provided

speculative testimony regarding which of the four weapons used by

the offenders in this case could have produced the injuries

sustained by the victims. Dr. Nancy Jones, a forensic pathologist

employed in the Cook County medical examiner's office, testified

regarding the autopsies performed on the victims by Dr. Robert

Stein, the former chief medical examiner of Cook County, who had

since retired and who did not testify at trial. Dr. Evans had

reviewed Dr. Stein's reports, and she had also examined the

photographs depicting the victims' injuries. Dr. Evans had also

compared the four knives recovered by authorities in their

investigation of the case with the information concerning the

victims' stab wounds, and in her testimony she explained which

knives could have caused the injuries to the victims. The defendant

argues that this portion of Dr. Evans' testimony was speculative at

best, challenging the basis for many of her conclusions.

          Defense counsel was, of course, free to cross-examine the

witness on the strength of her testimony, and on her ability to

assess, from Dr. Stein's reports and from her own observations of

the knives and morgue photographs, which weapons might have been

used. We believe that the weaknesses the defendant perceives in Dr.

Jones' testimony pertain to its strength rather than to its

admissibility, and we do not believe that the trial judge erred in

permitting the jury to hear this evidence.

          The defendant also argues that Detective McCabe offered

improper hearsay testimony when he repeated to the jury Mildred

Orange's summary of her telephone conversation with the defendant

on the afternoon of January 12. The trial judge overruled defense

counsel's hearsay objection to the testimony. We agree with the

defendant that this portion of McCabe's testimony was hearsay and

should not have been admitted into evidence. We do not, however,

believe that the defendant was denied a fair trial by the judge's

adverse ruling. The jury had already heard Mrs. Orange testify to

the same statement by the defendant, and, as the trial judge noted,

McCabe's separate account was essentially cumulative of the earlier

testimony.

          The defendant contends, however, that McCabe added to the

description of the telephone conversation a detail that was absent

from Mrs. Orange's account. According to McCabe, the defendant told

Mrs. Orange that what he and Leroy had done had occurred "last

night." The defendant notes that the prosecutor found this

additional bit of information significant enough to be worthy of

mention in closing argument.

          We do not believe that the trial judge's decision to

admit this testimony could have denied the defendant a fair trial.

The evidence of the defendant's guilt for these offenses was

overwhelming, and we do not believe that the present hearsay

testimony proved to be prejudicial. The jury heard the series of

statements in which the defendant admitted a role in these crimes,

and the testimony describing the way in which the defendant was

able to lead investigators to the murder weapons.

          In a further challenge to evidence presented at trial,

the defendant argues that Mildred Orange was improperly allowed to

provide the jury with her assessment of the defendant's

personality. The testimony was presented when the prosecutor asked

Mrs. Orange whether or not the defendant had a compliant

personality. Mrs. Orange replied that he did not, saying that the

defendant "did whatever he wanted to do." The trial judge overruled

the defendant's objection to Mrs. Orange's comment. On appeal, the

defendant renews his contention that the witness was not qualified

to provide an assessment of his personality. We do not consider

here whether Mrs. Orange was properly qualified to express an

opinion on the subject, for, even if she was not, we do not believe

that the admission of the testimony was prejudicial to the

defendant. As we have noted, the State presented overwhelming

evidence of the defendant's guilt. Although the defense offered

evidence of the defendant's compliant personality to help explain

what led the defendant to testify at Leroy Orange's trial, we do

not believe that this brief attempt by the State to rebut a portion

of the defense theory could have deprived the defendant of a fair

trial.

                                     G

          The defendant next argues that the trial judge abused his

discretion in allowing the jury, at the close of the State's case

in chief, to view a large number of photographs of the decedents.

These pictures were taken either at the crime scene or during the

autopsies of the victims, and they depict the victims' injuries and

the condition in which the victims were found.

          "Photographs of a victim, though gruesome, may be

admissible if relevant. (People v. Shum (1987), 117 Ill. 2d 317,

353-54; People v. Lindgren (1980), 79 Ill. 2d 129, 143.) The

decision whether to admit photographs into evidence is committed to

the discretion of the trial judge, whose determination will be

upheld unless it is an abuse of discretion. People v. Rissley

(1995), 165 Ill. 2d 364, 403; Shum, 117 Ill. 2d at 353." People v.

Bounds, 171 Ill. 2d 1, 47 (1995).

          In the present case, the trial judge examined the

photographs in chambers before allowing the jury to view them.

Following that evaluation, the judge concluded that a number of

them could not be presented to the jury. The judge permitted the

jury to see the remainder of the photographs, approximately 40 in

all. We have reviewed the same exhibits and find no abuse of

discretion in the trial judge's determination of which exhibits

could be shown to the jury.

          This court has previously observed that photographic

evidence is admissible to show the nature and extent of a victim's

injuries, the condition or location of a body at the crime scene,

or the manner or cause of death, among other uses. People v.

Henderson, 142 Ill. 2d 258, 319-20 (1990). The photographs

challenged by the defendant fulfilled these purposes here. They

showed the restraints used on the victims, as well as the number

and severity of their stab wounds. In addition, the photographs

assisted the jury in understanding the forensic testimony

introduced by the prosecution. We find no abuse of discretion in

the use of these photographs at trial.

          The defendant also complains that the timing of the

publication of these exhibits was especially prejudicial. The

photographs were shown to the jury over the defendant's objection

at the close of the State's case in chief. Trial counsel thought

that the nature of the photographs would distract the jurors from

a consideration of the defendant's evidence, and counsel wanted to

postpone presentation of these exhibits until the close of evidence

in the case.

          We do not believe that the judge abused his discretion in

permitting the photographs to be shown to the jury at the close of

the State's evidence. The photographs had been referred to

extensively in the earlier testimony, and that was a logical point

in the proceedings at which to publish them to the jury. The

disturbing nature of these exhibits would not have been reduced by

delaying their presentation; they were admissible, and they could

be shown to the jury.

                                     H

          The defendant also raises a number of challenges to

various portions of the State's closing argument at trial. The

defendant first complains of a series of remarks that, he contends,

improperly disparaged defense counsel and denigrated the defense

attorneys' efforts on behalf of their client. At one point, the

prosecutor said, "It is our job to assure that justice is done and

the truth be told." Defense counsel did not object to that comment,

and therefore any challenge here has been waived. Later, in

rebuttal, the prosecutor said that the defendant's various lies

were designed to distract the jurors and to muddy up the waters.

The trial judge overruled defense counsel's objections to these

remarks. Unlike the defendant we do not believe that these last

remarks were targeted at defense counsel; the prosecutor was

referring to the defendant, not to his attorneys. We find no error

in the remarks, which were fair comments on the evidence.

          The defendant also challenges a remark by the prosecutor

that a not-guilty verdict would enable the defendant to avoid

punishment for the present offenses and thus commit the perfect

crime. We agree with the State that the jurors would not have

construed this comment as an attack on the integrity of defense

counsel. Counsel did not object to the later comment that, "to that

end, he dispatches his attorneys up here," and we thus conclude

that the defendant has waived his challenge to that remark.

          The trial judge sustained defense counsel's objection to

a comment that one imperfection of the criminal justice system is

that the defendant can "lie and lie and lie" and that his attorneys

"can stand up here and argue to you that those lies stand as proof

of his innocence." In light of the judge's ruling, we do not

consider this comment further. 

          The defendant next cites a comment by the prosecutor

declaring that defense counsel had made a "bald-faced claim" in

opening statement. In this remark, the prosecutor was referring to

defense counsel's earlier assertion that Leroy Orange had led

police to the murder weapons; no evidence was presented to support

that proposition, however, and thus we agree with the State that

the comment was not unwarranted.

          The defendant also takes issue with a remark in which the

prosecutor asserted that defense counsel wanted the jury to

misunderstand the significance of the clothing found by Mrs. Orange

after the offenses here. The interpretation of this evidence was

the subject of some dispute by the parties, and we do not believe

that the prosecutor's brief comment was unfair or unwarranted.

          The defendant next complains that the prosecution

misstated the law of accountability at various points during

summation and rebuttal by misrepresenting the mental state

necessary to sustain a verdict under an accountability theory. The

prosecutors made a number of comments concerning accountability;

one of them also read the accountability instruction to the jurors.

We note that defense counsel did not object to all the comments

cited in the defendant's brief, and therefore the challenges to

those remarks have been waived. We believe that, taken as a whole,

the comments by the prosecution on accountability were not

misleading. We note that the jurors received accurate instructions

setting forth the law of accountability. In addition, the jurors

were properly instructed regarding the purpose of closing

arguments.

          The defendant also contends that a further comment by the

prosecutor aggravated these alleged errors, when the prosecutor

stated, in rebuttal, that the burden of proof beyond a reasonable

doubt "is a burden of proof that is met in courtrooms across this

county and in this building each and every day, and it is a burden

of proof that has been met here." The defendant contends that this

last comment improperly minimized the importance of the State's

burden of proof. Defense counsel did not object to this last

comment, however, and therefore has waived this contention. We

note, moreover, that this court has previously rejected the

argument that comments of this nature improperly reduce the State's

burden of proof. People v. Gacho, 122 Ill. 2d 221, 255 (1988).

          The defendant also complains that, in another series of

comments, the prosecutor improperly criticized a defense witness

and her testimony concerning the defendant's mental abilities. In

argument, the prosecution referred to the witness on one occasion

as "Miss Wetzel," though she possessed a Ph.D. degree, and said

that it was "unfortunate indeed that she didn't test [the

defendant's] moral fiber because we would have found he has none."

The prosecutor also argued that the witness' testimony was

irrelevant and said that the defendant was not mentally retarded.

In addition, the prosecutor asserted that, by the law of averages,

half the population must be of below-average intelligence. The

defendant maintains that Dr. Wetzel's testimony was relevant in

this case, and asserts that the evidence established that the

defendant was mentally retarded. We believe that the preceding

remarks were either fair comments on the evidence in the case, or

were so minor that they could have had no influence on the jury's

deliberations.

          The defendant's final challenge to the State's closing

argument at trial involves a comment by the prosecutor concerning

the victims' surviving family members. At the conclusion of his

rebuttal argument, the prosecutor stated:

                    "After today, when you think about this case,

               however often or however seldom, when you do think

               about it, think about Renee and Michelle and

               Ricardo. If you're religious, offer a prayer. If

               you're not, just--just imagine what this must have

               been like for them, and imagine what it's like now

               for the family. When you think about the case, shed

               a tear for Tony Coleman.

                    [Defense counsel]: Objection.

                    THE COURT: Sustained. The jury will disregard

               that.

                    MR. JOYCE: Well, just think then about this

               nine-year-old boy who will never light up his

               grandfather's home with his infectious smile, who

               was nine years old and today is nine years dead.

               Remember him however you will, but remember him not

               because that is the least, but because that is the

               beginning--the beginning of the very least we can

               do. Thank you."

The trial judge's ruling sustaining the defendant's objection to

the initial reference to the victims should have been sufficient to

forestall any prejudice. We do not believe that the rhetorical

flourish of the prosecutor's ensuing comment could have been

prejudicial here.

                                     I

          The defendant argues that there was insufficient evidence

of facts supporting his convictions for felony murder and armed

robbery. Armed robbery served as the predicate felony for the

felony murder charges, and the defendant argues here that the

State's evidence failed to establish that offense. The armed

robbery charge alleged the defendant's taking of Ricardo Pedro's

watch, which the defendant was wearing at the time of his arrest.

The defendant argues that the prosecution was required to prove

that he used force or the threat of force as the means of taking

the property from the victim. Citing People v. Tiller, 94 Ill. 2d

303 (1982), and People v. Pack, 34 Ill. App. 3d 894 (1976), the

defendant believes that the evidence in this case establishes

nothing more than that he took the watch from Pedro as an

afterthought.

          Section 18--1(a) of the Criminal Code of 1961 defines the

offense of robbery in the following terms: "A person commits

robbery when he takes property from the person or presence of

another by the use of force or by threatening the imminent use of

force." Ill. Rev. Stat. 1983, ch. 38, par. 18--1(a). Armed robbery

is the commission of robbery while armed with a dangerous weapon.

Ill. Rev. Stat. 1983, ch. 38, par. 18--2(a).

          This court addressed a similar argument in People v.

Strickland, 154 Ill. 2d 489, 523-25 (1992). In that case, we

rejected a defendant's contention that his armed robbery conviction

had to be reversed because there was insufficient evidence that the

force exerted by the defendant against the victim was intended or

used as a means of taking the victim's property. The court quoted

the following language from People v. Jordan, 303 Ill. 316, 319

(1922):

               "The fact that the defendant [sic] had been reduced

               to a state of physical non-resistance before his

               money was taken does not relieve the crime of the

               quality constituting robbery. If, as the result of

               a quarrel, a fight occurs in which one of the

               parties is overcome, and the other then, without

               having formed the intention before the fight began,

               takes the money of the vanquished one, the offense

               committed is robbery."

          Strickland found the principle expressed in Jordan, a

decision under former law, to be applicable to the current statute

as well. Strickland, 154 Ill. 2d at 524. "Section 18--1 of the

Criminal Code requires that the taking be accomplished by force or

the threat of force. Such was obviously the case here, regardless

of whether the defendant had previously formulated an intent to

take the [victim's] weapon or other property." Strickland, 154 Ill.

2d at 524-25.

          We believe the evidence in this case was sufficient to

establish the defendant's guilt for armed robbery. When the

defendant was asked by the police how he happened to have Pedro's

watch, the defendant initially explained that he had received it

from the victim in exchange for the TV/radio. The defendant later

said that Pedro had given him the watch but had asked him not to

tell Leroy Orange about the gift. In his testimony at Orange's

trial, however, the defendant said that he stabbed Pedro, later

took the watch from Pedro's arm, and subsequently murdered him. The

jury was entitled to accept this last explanation as the truth, and

we find no reason here to disturb these verdicts. Moreover, even if

the defendant's use of force preceded the actual taking of the

property, the offense would still be armed robbery under Strickland

and Jordan. As in Strickland, we conclude that there was the

necessary concurrence between the defendant's use of force and his

taking of Ricardo Pedro's watch. See also People v. Ward, 154 Ill.

2d 272 (1992); People v. Blake, 144 Ill. 2d 314 (1991); People v.

Williams, 118 Ill. 2d 407 (1987).

                                     J

          The defendant next argues that the trial judge erred in

denying one of the issues raised by the defendant in a pro se post-

trial motion without having first appointed new counsel to

represent him. The defendant asserts that once he submitted a pro

se motion for a new trial that challenged the conduct of the trial

attorneys, the judge was obligated to appoint alternative counsel

to represent him on the motion. Among the numerous claims raised in

the two post-trial motions filed by the defendant pro se was the

charge that trial counsel failed to subpoena and present at trial

the testimony of two alibi witnesses. The motion in which this

allegation appears does not identify these persons or otherwise

shed any light on who they might be. On appeal, the defendant

argues that he was essentially raising an ineffective assistance

claim, though his motions do not couch the point in those terms,

and the defendant insists that he was entitled to have different

counsel represent him on the issue. See People v. Krankel, 102 Ill.

2d 181, 189 (1984). We do not agree.

          In People v. Nitz, 143 Ill. 2d 82, 133-35 (1991), this

court determined that different counsel is not automatically

required in every case in which a defendant files a motion

challenging the performance of his trial attorney. See also People

v. Williams, 147 Ill. 2d 173, 250-53 (1991). If the matters raised

in a defendant's pro se motion clearly lack merit or merely pertain

to matters of trial strategy, the trial court "may dispose of the

motion without having appointed a new attorney to assist the

defendant in the presentation of those claims." People v.

Strickland, 154 Ill. 2d 489, 527 (1992). "If, however, the

defendant's allegations of incompetence indicate that trial counsel

neglected the defendant's case, the court should appoint new

counsel to argue defendant's claims of ineffective assistance of

counsel." Nitz, 143 Ill. 2d at 134-35.

          Here, the only pro se allegation mentioned by the

defendant on appeal involves counsel's failure to call two unnamed

alibi witnesses to testify in the defendant's behalf at trial.

Whether to call certain witnesses and whether to present an alibi

defense are matters of trial strategy, generally reserved to the

discretion of trial counsel. See People v. Ramey, 152 Ill. 2d 41,

53-54 (1992). We would note that an alibi defense would have been

particularly weak in this case, given the series of statements made

by the defendant in which he placed himself at the crime scene,

whether as a passive onlooker to his brother's rampage or as an

active participant in the offenses. Because the matter complained

of clearly lacked merit and simply involved a question of trial

strategy, we conclude that the trial judge did not err in failing

to appoint counsel to represent the defendant in connection with

this allegation in the pro se motion.

                                     K

          The defendant next argues that his conviction for

aggravated arson must be reversed because the statute on which the

charge is based has been declared unconstitutional. The State

agrees with the defendant that the conviction is invalid. The

parties do not agree, however, on the effect of the reversal on the

defendant's death sentence. The defendant was convicted of

aggravated arson under section 20--1.1(a)(1) of the Criminal Code

of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 20--1.1(a)(1)); that

provision has been held unconstitutional, however (People v.

Johnson, 114 Ill. 2d 69, 73 (1986)), and convictions under the

unconstitutional statute have accordingly been reversed on appeal

(see People v. Kidd, 129 Ill. 2d 432, 457 (1989); People v. Orange,

121 Ill. 2d 364, 392 (1988)). The same result is necessary here,

and therefore we reverse the defendant's conviction for aggravated

arson and vacate the 30-year sentence imposed for that offense.

          The defendant also briefly contends that the invalidity

of the aggravated arson conviction requires that he receive a new

sentencing hearing. The same argument was rejected in Orange, 121

Ill. 2d at 392-93, and we believe the same result appropriate here.

The aggravated arson charge did not form the basis for any one of

the three statutory aggravating circumstances used to establish the

defendant's eligibility for the death penalty in this case. Nor did

the additional conviction figure prominently at the second stage of

the sentencing hearing, when the jury determined whether the

defendant should be sentenced to death. Moreover, notwithstanding

the invalidity of the statute defining the charged offense, the

jury was free to consider the conduct on which the charge was

based. We conclude here, as we did in Orange, that the reversal of

the defendant's conviction for aggravated arson conviction does not

require a new sentencing hearing.

                           II. Sentencing Issues

                                     A

          The defendant also makes a number of challenges to the

death sentence proceedings conducted in this case. The defendant

first raises several arguments with respect to the trial judge's

examination of the prospective jurors concerning their attitudes

toward capital punishment. The defendant contends that the

questioning conducted by the judge in this case failed to properly

"life qualify" the venire under Morgan v. Illinois, 504 U.S. 719,

119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992), and that the judge erred

in refusing to use several questions proposed by defense counsel.

The defendant maintains that the questions used by the judge did

not properly detect members of the venire who would automatically

vote to impose the death penalty.

          We believe that the judge's inquiry was sufficient to

satisfy the requirements of Morgan. In the present case, the judge

asked each prospective juror whether the person would automatically

vote for the death penalty no matter what the facts of the case

might be. In addition, the judge asked whether the person could

consider all the possible penalties under the law if the defendant

were found guilty. We believe that the trial judge's inquiry was

sufficient under Morgan.

          In a further argument relating to jury selection, the

defendant contends that the voir dire responses of two of the

persons who served on the jury in this case demonstrated their

inability to impartially determine whether the defendant was

deserving of the death penalty. The State responds that the jurors

did not make disqualifying statements at voir dire and were

properly allowed to serve on the jury. The State also observes that

defense counsel waived any objection to these persons because the

attorneys did not make any challenges to these members of the

venire. We agree with the State that the defendant waived his

objections to these two jurors (People v. Collins, 106 Ill. 2d 237,

271-72 (1985)), and we need not consider these contentions further.

                                     B

          The defendant next raises two arguments relating to the

first stage of the capital sentencing hearing. The defendant argues

that the prosecutor made an improper appeal to the jury at the

conclusion of the eligibility stage of the hearing when, in

rebuttal argument, he said that defense counsel, in requesting the

jury to find the defendant not eligible for the death penalty, was

in reality asking the jurors to violate their oaths and abrogate

their responsibilities. The trial judge overruled defense counsel's

objections to these comments. The defendant argues that the

prosecutor's remarks improperly accused defense counsel of urging

the jury to violate the law.

          Construed in context, the prosecutor's remarks were

unobjectionable. Defense counsel had already argued to the jury

that the defendant would be spared from the death sentence if only

one juror refused to sign the verdicts finding the defendant

eligible for the death penalty. Proof of the defendant's

eligibility for the death penalty was overwhelming, and defense

counsel's argument was simply an appeal to the jury to ignore the

evidence in the case and to refuse to find the defendant eligible

for the death penalty. We believe that the prosecutor's rebuttal

argument, in the context in which it occurred, was a fair reply to

defense counsel's own impassioned appeal.

          The defendant also challenges the constitutionality of

one of the statutory aggravating circumstances used in this case to

establish the defendant's eligibility for the death penalty.

Section 9--1(b)(7) of the Criminal Code of 1961 authorizes the

imposition of the death penalty if "the murdered individual was

under 12 years of age and the death resulted from exceptionally

brutal or heinous behavior indicative of wanton cruelty." Ill. Rev.

Stat. 1983, ch. 38, par. 9--1(b)(7). One of the victims in the

present case, Anthony Coleman, was nine years old at the time of

his death.

          The defendant argues that the preceding provision is

unconstitutionally vague. See Maynard v. Cartwright, 486 U.S. 356,

100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988). In our earlier opinion

in this case, however, we upheld the validity of this aggravating

circumstance against an identical challenge. Although at that time

this court determined that the defendant's guilty plea was invalid

and vacated the defendant's convictions and sentences and remanded

the cause for further proceedings, the court also addressed several

challenges raised by the defendant that were likely to arise on

retrial, including the defendant's challenge to the validity of the

section 9--1(b)(7). People v. Kidd, 129 Ill. 2d 432, 454-56 (1989).

That determination became the law of the case, and we will not

disturb it here. We note that the jury in the present case received

instructions defining the terms "brutal" and "heinous."

          Finally, if any doubt should remain concerning the

validity of the aggravating circumstance used in this case, with

the special instructions defining the relevant terms, we would

observe that two other statutory aggravating circumstance

independently supported the jury's eligibility finding, in addition

to the circumstance being challenged here. In the present case, the

jury also found the defendant eligible for the death penalty on the

ground that he murdered more than one person, and on the ground

that he committed a felony during the course of one murder. Ill.

Rev. Stat. 1983, ch. 38, pars. 9--1(b)(3), (b)(6). The jury

returned separate findings on each aggravating circumstance, and

therefore the alleged invalidity of this third aggravating

circumstance would not have affected the determination that the

defendant was eligible for the death penalty. The defendant does

not contend that any infirmity in the provision found in section 9-

-1(b)(7) would have spilled over into the second stage of the

sentencing hearing.

                                     C

          The defendant also contends that the trial judge erred in

refusing jury instructions tendered by defense counsel regarding

certain nonstatutory mitigating circumstances at the conclusion of

the second stage of the death penalty. Counsel wanted the jurors to

be specifically instructed that mitigating circumstances included,

among other things, the defendant's mental retardation, his abusive

home life, and his deprived childhood. The trial judge refused the

tendered instructions.

          We agree with the State that no error occurred in the

trial judge's refusal of the instructions submitted by defense

counsel. The jurors were told, pursuant to the pattern

instructions, that mitigating factors included "[a]ny other reason

supported by the evidence why the defendant should not be sentenced

to death." Illinois Pattern Jury Instructions, Criminal, No. 7C.06

(3d ed. 1992). The jurors were thus apprised that they were to

consider any relevant circumstance in making their decision, and we

find no error in the trial judge's refusal of the proffered

instructions. This court has previously rejected efforts to define

the term "mitigating factor" (People v. Gilliam, 172 Ill. 2d 484,

520 (1996)), or, as in this case, to specify nonstatutory

mitigation at the second stage of the death penalty hearing (People

v. Gosier, 145 Ill. 2d 127, 159-60 (1991); People v. Spreitzer, 123

Ill. 2d 1, 40-41 (1988); People v. Stewart, 104 Ill. 2d 463, 492-93

(1984); People v. Free, 94 Ill. 2d 378, 419-20 (1983)).

                                     D

          The defendant next raises a series of arguments regarding

the prosecution's conduct at the second stage of the capital

sentencing hearing. The defendant first challenges portions of the

prosecution's closing argument. The defendant contends that the

prosecutor improperly told the jurors that if they did not vote in

favor of imposing the death penalty in this case, they would have

abrogated their oaths. After referring to the defense evidence

regarding the impact of the death of the defendant's father on the

defendant, the prosecutor said, "That's the excuse that they want

to utilize for you to abrogate your oath." The trial judge

sustained the defendant's objection to this last comment and

instructed the jury to disregard it. We believe that the trial

judge's prompt action in sustaining the defendant's objection was

sufficient to cure any prejudice the comment might otherwise have

engendered. See People v. Tenner, 157 Ill. 2d 341, 384-85 (1993);

People v. Baptist, 76 Ill. 2d 19, 30 (1979).

          In addition, the defendant complains that the prosecutor

told the jury that if the defendant were not sentenced to death, he

would pose a threat to everyone in the penitentiary. The defendant

argues that these comments violated People v. Hooper, 133 Ill. 2d

469, 500 (1989). Hooper, however, only forbids comments that are

not based on the evidence. We believe that the evidence in this

case supported the prosecutor's argument that the defendant would

pose a threat to others if he received a sentence of imprisonment.

For evidence in aggravation, the State presented extensive

testimony detailing the defendant's prior infractions in jail and

in prison. These involved numerous altercations with other inmates

and with correctional personnel, as well as threats made by the

defendant against others. Because there was evidence of the

defendant's prior misconduct while incarcerated, we believe that it

was proper for the State to argue that the defendant would be a

threat to others if he did not receive the death penalty. See

People v. Bounds, 171 Ill. 2d 1, 66 (1995); People v. Johnson, 146

Ill. 2d 109, 148-49 (1991); see also Simmons v. South Carolina, 512

U.S. ___, ___ n.5, 129 L. Ed. 2d 133, 143 n.5, 114 S. Ct. 2187,

2194 n.5 (1994) ("Of course, the fact that a defendant is parole

ineligible does not prevent the State from arguing that the

defendant poses a future danger. The State is free to argue that

the defendant will pose a danger to others in prison and that

executing him is the only means of eliminating the threat to the

safety of other inmates or prison staff").

          The defendant next complains that the prosecution invited

the jury to vindicate the victims for the crimes committed against

them, and that the prosecution misstated the law applicable to the

defendant's mitigating evidence. The prosecutor argued, "Anthony

Coleman is dead and someone has to speak for him. Question you have

to decide with respect to the law isn't whether there are any

mitigating factors--." Defense counsel interposed an objection, and

the trial judge reserved ruling on the objection; the prosecutor

went on to say that the question the jury had to decide was whether

the evidence in mitigation was sufficient to preclude a sentence of

death; the trial judge overruled defense counsel's objection to

this last comment. It was an accurate statement of law, and we find

no error in the judge's ruling.

          The defendant also complains of a statement in which the

prosecutor said, "[The defendant] deserves four death sentences,

one for Ricardo, one for Renee, one for Michelle, and however many

you can conceive of for Anthony." Defense counsel did not object to

this last comment, and therefore we consider his argument waived.

In any event, we do not believe that the remark would have caused

the jury to ignore its instructions or to disregard the evidence in

the case.

          The defendant also objects to comments by the prosecutor

disputing the mitigating nature of the evidence introduced by the

defense, which included testimony describing the defendant's mental

retardation, organic brain disorder, epilepsy, and deprived and

abused childhood. We find no error here. Our cases have held that

the State is not required to agree with the defendant that the

evidence presented by the defense in mitigation is actually

mitigating. People v. Cole, 172 Ill. 2d 85, 112 (1996); People v.

Page, 155 Ill. 2d 232, 277-80 (1993); People v. Bean, 137 Ill. 2d

65, 124-27 (1990); see also People v. Henderson, 142 Ill. 2d 258,

335-41 (1990) (trial judge's failure to view defendant's evidence

as mitigating). As the Supreme Court noted in Penry v. Lynaugh, 492

U.S. 302, 324, 106 L. Ed. 2d 256, 281, 109 S. Ct. 2934, 2949

(1989), "Penry's mental retardation and history of abuse is thus a

two-edged sword: it may diminish his blameworthiness for his crime

even as it indicates that there is a probability that he will be

dangerous in the future."

          The defendant raises a final series of arguments

challenging the prosecution's actions at the second stage of the

sentencing hearing. First, the defendant complains of conduct by

the prosecutor during the cross-examination of Dr. Savarese. The

defendant complains that the prosecutor screamed questions at the

witness and, in asking the witness about his evaluation of the

defendant, referred to the defendant on one occasion as a "jerk"

and on another occasion as "Mr. Mentally Retarded." The trial judge

sustained defense counsel's objections to the comments, and

instructed the prosecutor to stop screaming at the witness. We

believe that these curative steps were sufficient to forestall any

prejudice.

          The defendant raises several further challenges to the

prosecutor's closing argument at the sentencing hearing. The

defendant cites the prosecutor's comment that the defendant was

"supposedly retarded," the prosecutor's reference to Dr. Wetzel as

"Miss One Hundred and Fifty Dollars an Opinion," and his comment on

that witness' failure to conduct further tests of the defendant's

brain functioning. In addition, the defendant objects to the

prosecutor's characterization of the defense efforts as "pathetic"

and his statement that he would feel like Pinocchio if he were

making the defendant's arguments. We believe that three of these

comments, to which the trial judge overruled objections, were

proper. The "pathetic" appellation was apparently directed at

defense counsel's argument that sparing the defendant from the

death penalty would stop "the killing" and would put an end to the

defendant's celebrity status. Arguing that the defendant was

supposedly retarded was not a misstatement of the evidence; whether

the defendant was mentally retarded was disputed at trial. Finally,

the State could properly comment on Dr. Wetzel's failure to order

further tests that might have provided further confirmation of her

diagnosis of the defendant's mental condition. Her failure to do so

had been the subject of extensive cross-examination.

          We do not consider here the two remaining comments raised

by the defendant. Defense counsel made no objection to the

prosecutor's reference to Dr. Wetzel, and her hourly rate, as "Miss

One Hundred Fifty Dollars An Opinion," and the trial judge

sustained the prosecutor's comparison of defense counsel to

Pinocchio ("If I had to stand up here and give the arguments they

gave I would feel like Pinocchio").

          Although we have found no reversible error in the

arguments of the two assistant State's Attorneys, Timothy Joyce and

David O'Connor, either at trial or at sentencing, we do not intend

to suggest by our ruling that we approve of all the remarks

challenged here. Indeed, prosecutors violate the trust reposed in

them by the public when they risk reversal of an otherwise proper

conviction or death sentence for unprofessional conduct of this

nature.

                                     E

          As a final matter, the defendant raises a number of

constitutional challenges to the Illinois death penalty statute,

section 9--1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983,

ch. 38, par. 9--1). Our court has considered and rejected the same

arguments many times in the past, and the defendant offers no new

grounds that would compel a different result here.

          Our cases have determined that the statute is not

unconstitutionally vague for permitting the sentencer to consider

"any" aggravating circumstance supported by the evidence (Ill. Rev.

Stat. 1983, ch. 38, pars. 9--1(c), (e)) in deciding whether to

impose the death penalty. People v. Cole, 172 Ill. 2d 85, 114

(1996); People v. Taylor, 166 Ill. 2d 414, 439 (1995); People v.

Young, 128 Ill. 2d 1, 59 (1989). This court has ruled that the

statute does not place a burden of proof on the defense that

effectively precludes the sentencing authority from giving

meaningful consideration to a defendant's mitigating evidence.

People v. Page, 155 Ill. 2d 232, 283 (1993); People v. Strickland,

154 Ill. 2d 489, 539 (1992); People v. Hampton, 147 Ill. 2d 71,

116-17 (1992).

          Our cases have held that the statute is not invalid for

the discretion it gives the prosecutor in deciding whether to seek

the death penalty in a particular case. People v. Lewis, 88 Ill. 2d

129, 146 (1981); People ex rel. Carey v. Cousins, 77 Ill. 2d 531,

534-43 (1979); see also Silagy v. Peters, 905 F.2d 986, 993-94 (7th

Cir. 1990). This court has previously rejected the contention that

various features of the death penalty statute invite the arbitrary

and capricious imposition of that sentence. People v. Harris, 164

Ill. 2d 322, 352 (1994); People v. Page, 155 Ill. 2d 232, 284-85

(1993); People v. Pitsonbarger, 142 Ill. 2d 353, 409 (1990). Our

court has determined that the death penalty statute is not invalid

for failing to require the jury to make a separate determination

that death is the appropriate punishment in the case. People v.

Whitehead, 116 Ill. 2d 425, 462 (1987); People v. Montgomery, 112

Ill. 2d 517, 534 (1986); People v. Stewart, 105 Ill. 2d 22, 76-77

(1984).

          The court has also held that the statute does not place

on the defendant the risk of nonpersuasion at the sentencing

hearing (People v. Fields, 135 Ill. 2d 18, 76 (1990); People v.

Orange, 121 Ill. 2d 364, 390 (1988); People v. Caballero, 102 Ill.

2d 23, 49 (1984)), and thus a defendant is not denied a fair

sentencing hearing when the prosecution is permitted to present

rebuttal argument at the second stage of the hearing (People v.

Tenner, 157 Ill. 2d 341, 382 (1993); People v. Page, 155 Ill. 2d

232, 282-83 (1993); People v. Ramirez, 98 Ill. 2d 439, 468-69

(1983); People v. Williams, 97 Ill. 2d 252, 302-03 (1983)).

Finally, the court has found that the death penalty statute

provides sufficient information gathering procedures to insure

adequate appellate review of death sentences. People v. King, 109

Ill. 2d 514, 550-51 (1986); People v. Albanese, 104 Ill. 2d 504,

541-42 (1984).

                                  *  *  *

          For the reasons stated, the judgment of the circuit court

of Cook County is affirmed in part and reversed in part. The clerk

of this court is directed to enter an order setting Tuesday, March

11, 1997, as the date on which the sentence of death entered in the

circuit court of Cook County is to be carried out. The defendant

shall be executed in the manner provided by law. 725 ILCS 5/119--5

(West 1994). The clerk of this court shall send a certified copy of

the mandate in this case to the Director of Corrections, to the

warden of Stateville Correctional Center, and to the warden of the

institution where the defendant is now confined.

Judgment affirmed in part

                                                    and reversed in part.

                                                                         

          JUSTICE McMORROW, specially concurring:

          Although I join in the majority's decision to affirm

defendant's conviction and sentence, I write separately because I

believe that the prosecutorial misconduct in the case at bar should

be strongly condemned by this court. There is no justification for

prosecutors, who are officers of the court, to conduct a campaign

of invective against a defendant, defense counsel, and witnesses

who testify on behalf of the defendant. 

          Most of the conduct and remarks challenged by defendant

occurred either during the closing argument at the guilt/innocence

phase of trial or during the capital sentencing proceedings. The

record indicates that during the guilt/innocence phase of trial,

one of the prosecutors made repeated suggestions in his closing

argument that defendant and his counsel were lying or not to be

believed. The prosecutor informed the jury that one of the

imperfections of the criminal justice system was that defense

"attorneys can stand up here and argue to you that those lies stand

as proof of [defendant's] innocence." The prosecutor's personal

opinion regarding the veracity of defense counsel and flaws in the

adversarial system of justice was unjustifiable, and had the

potential to improperly influence the decision of the jury.

          The most egregious conduct and remarks occurred during

the capital sentencing proceedings, where one of the prosecutors at

times argued with defense witnesses, using sarcasm and name

calling. The record indicates that the prosecutor, during his

cross-examination of Dr. Savarese, screamed questions at the

witness and referred to defendant as "a jerk" and "Mr. Mentally

Retarded." The prosecutor's denigration of the defense continued

throughout his summation to the jury, during which he called Dr.

Wetzel, "Miss One Hundred and Fifty Dollars an Opinion." 

          Capital sentencing proceedings impose upon the jury the

serious duty of determining whether or not a defendant is eligible

for and deserving of the death penalty, the most severe and

irreversible state-sanctioned punishment available. The risk that

a prosecutor's improper remarks may inflame the jury is an

important concern for reviewing courts as well as trial courts. 

          In the case at bar, the trial court sustained defense

objections to some of the objectionable remarks, which the majority

concludes cured any prejudice that might otherwise have occurred.

Although a new trial is not always a necessary sanction for

improper remarks of the prosecutor, prosecutorial behavior which

repeatedly exceeds the bounds of zealous advocacy debases the

proceedings and creates an unnecessary diversion from the evidence

and the law. 

          It is significant that in addition to the degrading name

calling and screaming that the prosecutors in the instant case

engaged in, they also implied that the jurors would be violating

their oaths if they returned a verdict other than death. This

misstatement of the law cannot be lightly glossed over as

inadvertent or insignificant. In my opinion, merely holding that

any error was cured by the trial court's sustaining the defense

objection to the remark does not adequately dispose of the issue.

Unless the trial and reviewing courts rebuke such egregious

misconduct, there is little incentive in future cases for others to

refrain from improper jibes, sarcasm, and outright distortions of

the law. No matter how deplorable the crime in issue or how

inadequate the defense theories may be perceived by the

prosecution, the larger policies of fair trial and proper courtroom

decorum inveigh against the type of prosecutorial remarks and

conduct that occurred here. Such behavior benefits no one, not the

people of Illinois who are represented by the prosecutor, not the

victim's families, and certainly not the individuals whose sole

transgression was to give testimony on behalf of the defense. 

          In my opinion, the conduct described herein borders on

constituting reversible error. For these reasons, I write

separately to emphasize my strong disapproval of the prosecutorial

remarks in the instant case and to caution lawyers and judges to

vigorously guard against such unprofessional conduct.

          JUSTICE FREEMAN joins in this special concurrence.

          JUSTICE HARRISON, dissenting:

          There is no dispute that at the time of trial and

sentencing, defendant was taking the medication Dilantin under

medical direction. For the reasons set forth in my special

concurrence in People v. Britz, No. 76618 (October 18, 1996), he

was therefore entitled to a fitness hearing under section 104--

21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104--

21(a) (West 1992)). By its express terms, the version of the

statute in effect here applies to any defendant who is taking

medication under medical direction even where, as here, the

medication is not psychotropic in nature. No principle of statutory

construction supports a contrary conclusion. 

          In filing this dissent today, I am departing from my

usual policy. When my colleagues and I disagree on a legal point,

such as the construction of a statute, I normally write separately

only in the first case that presents the issue. Once the court has

issued its opinion on the disputed point, I consider it to be the

law of the state, which I am thereafter obligated to apply even if

I personally disagree with it. In this case, however, stare decisis

must yield to more fundamental concerns. I simply cannot abide an

interpretation of the law that deviates as wildly from settled

principles of statutory construction as does the majority's where,

as here, a human being's life is a stake. When the government

distorts the law to justify the execution of a defendant, its moral

authority is lost and I will not be a party to it. I was elected to

this office to be a judge, not a vigilante.

          The judgment of the circuit court should be reversed and

the cause should be remanded in accordance with People v. Brandon,

162 Ill. 2d 450 (1994). Accordingly, I dissent.